Bioremedi Therapeutic Systems, Mr. Farrah. Thank you, Your Honor. Here's the court. I'm here for the appellants. The only issue really before the court today is whether or not a chiropractor is qualified to give opinions regarding diagnosis and causation of foot wounds. The issue is pretty simple, but the posture of the case is a bit unique in that normally if there's a chiropractor and a challenge to a chiropractor's qualifications to testify about some medical issues, it's the defendants making that challenge and it's the plaintiffs who have offered that testimony. The case is a bit different in that the plaintiffs in this case offered the treating physician's opinions regarding the cause of the wounds, that there were burns, and the prognosis and the diagnosis. Let me ask you here. This whole thing seems a little odd to me. There was never a Daubert hearing, correct? There was a Daubert motion filed. There was a motion, but there was never a Daubert hearing. I'm not sure your motion actually requested a Daubert hearing. You referred to the case once, but I'll allow you to say what that motion did, but the court denied it without explanation. When the chiropractor started to testify, there was not any effort by the plaintiff to offer him as an expert witness, state his qualifications, questioning by you. I hereby offer him as an expert, object, and get some ruling on it. Is that correct? He was never qualified, meaning the district court never held that this is an expert in some field? Well, if you look at, and it's cited in the brief, if you look at the jury instruction that the trial judge gave to the jury whenever there was an objection to his qualifications, the judge said he can testify about these issues because he's a chiropractor, and the fact he's only a chiropractor goes to the weight of the evidence and not to the ... Are you saying from that, that in your view, he was never accepted, recognized as an expert? I don't think there was ever an express finding that he is an expert, but I think allowing him to testify over objections to his qualifications is tantamount to saying he's qualified to give these opinions. But when you made, were you the trial attorney? I was. Was that a sufficient objection, you think, to raise that this is an expert testifying about matters that are not within his expertise? Well, clearly, there's a reference back to the Dalbert motion that we filed to limit or strike his opinions, and I do think that an objection to the qualification of the witness to give the opinion of the question he's just asked is sufficient objection under 702. 702 talks about the witness has to be qualified, and that's the objection. It wasn't articulated maybe as well as it could have been, but I don't think it is an issue as preserving the objection that's there. Well, I have no doubt the judge knew what you meant, but you did not explain what you wanted is what concerns me other than not to let him testify, and you didn't try to invoke any kind of procedure at that stage. If you'll look in the excerpt from the transcript that we cited in the brief, I think you'll see I didn't have an opportunity to do that. When I objected, the court overruled it very quickly and started questioning the witness himself. It's tough to do a Dalbert challenge when the court is the one actually asking the expert-type questions to the witness. He was also—I gather he was also a fact witness to some extent. He was a treating physician or treating whatever he was, chiropractor. So he was sort of in a— He's a hybrid. Hybrid between a fact witness. And so there were some questions as a fact witness I guess he could answer about what went on and how this functioned since he had—he was the one giving the treatment or supervising the treatment. I agree. And as Appellee's brief points out, there's a lot of testimony that wasn't objected to. Obviously the things he did, the things he saw, he can testify to. Mr. Carlson went back to Mr. Durrett after the burns appeared, and there's some testimony about that. And what he saw that day I absolutely think he can testify to because that's his fact witness personal knowledge. It's saying what it was is the problem. Whenever he testifies that I saw those wounds and they're not burns, they're diabetic ulcers, now he's crossed well over the line of fact witness into expert witness. And how much weight do we give to his experience of treating patients in similar situations that are diabetics and him working with this machine and using it to treat patients and seeing similar burns or sores or wherever it might be? Don't we give some weight to his experience of treating people in similar situations some weight beyond just not being a doctor and not being a physician and not having a doctor degree or education, but he had this extensive experience? He has experience, I want to be clear, of treating neuropathy, which is very different than treating diabetes. He doesn't treat diabetes, and if he tried to treat diabetes, he'd be practicing medicine without a license. So I don't think that we give deference to the time because to do what he's doing, to diagnose and treat foot wounds, requires a medical degree. The Texas Occupation Code defines very distinctly what a chiropractor can and cannot do, which is interesting because I think a lot of challenges to expert witness testimony in the medical field. The line of where they are in their testimony is blurred. What can an orthopedic surgeon testify to regarding nerve damage and things like that where it's related? But this is very, very clear because the Texas Occupation Code delineates exactly what a chiropractor can do. And it's section 202.002, and it's to analyze, examine, and evaluate the biomechanical condition of the spine and musculoskeletal system. And I think the key words there are biomechanical condition and the spine and musculoskeletal system. So that's what he can do. He can move joints. Section 2 says he is able to perform nonsurgical procedures, including adjustments and manipulation, to improve biomechanics of the musculoskeletal system. He cannot treat foot wounds. He cannot diagnose wounds as either burns or diabetic ulcers or decubitus ulcers or any other type of ulcers. That's not what he does. Counsel, in order to rule in your favor, do we have to find or conclude that no chiropractor ever under any circumstances could offer an opinion like this? Or do we just need to conclude that Dr. Durrett, in this case, given what it is he knew and that his only area of expertise was chiropractic? If you have a person with the educational background of Dr. Durrett, which is no college, a two-year associate's degree, and a chiropractic, I think that the finding is absolutely that that person is not ever, ever allowed to testify to the things that Mr. Durrett testified to. I do think it is a global ruling. And I think if we look at the Ulin versus U.S. case out of the Seventh Circuit, it's 291 F. 3rd, 993, a similar situation happened where the trial judge instructed the jury that a chiropractor was testifying, and it was at least in his field, it was regarding a back injury, but instructed the jury that the fact is a chiropractor goes to the weight of the evidence and not whether or not the evidence should come in. And the Seventh Circuit said in one sentence, that ruling is wrong. It was wrong in this case. It was wrong in the Seventh Circuit, allowing Dr. Durrett to testify about these complex medical issues. And it's more than just... So I guess I'm getting back to where I think Judge Southwick asked, and this may not have been the upshot of his question, but I guess your point is he was offered up at some point, although I'm not so sure I ever saw it in the transcript. Because typically, in my limited experience as a trial judge, typically you call your expert witness, and you go through first his qualifications to testify in a field of expertise, and then at some point you actually offer up that this witness, Your Honor, we tended this witness as an expert in the field of, in this case, be chiropractic. So he's limited in terms of the opinions he can give. He's limited to opinions that have to do with that field, that area of expertise. And so is that what happened with Dr. Durrett in this case? So the defendants called Dr. Durrett, not plaintiffs. Right, I understand. He was the only witness called. And the defendants did go through his background about his schooling at the School of Chiropractic, his years in practice, and the type of practice that he has. So these expert qualification questions were definitely asked. There wasn't that kind of tendering as an expert. It was the qualifications, and then it just led into his treatment. And you didn't have any objection to any designation of him as an expert in that field? In the field of chiropractic? Absolutely not. All right. The interesting thing is he didn't do anything within the field of chiropractic to Mr. Carlson. In the opinions he gave at trial, none of them would be in that field. There was no manipulation. He wasn't ever accepted formally, in a way, by the district judge as an expert in the field of chiropractic, was he? I didn't see any ruling on that. I didn't even see any offering of him as that. No, he didn't give opinions in the field. No, no, no. Did the district judge ever accept him as an expert in some sort of formal ruling in any field? No, not in a formal ruling. I think, again, when I'm objecting to his qualifications and the court overrules it and then starts asking questions to the witness himself that are expert in nature, that is a— Well, just going back to what Judge Graves was talking about, this is just an unusual procedure, and that's what my initial question to you was about. He was never offered up. He was never accepted as an expert in any field. You finally get to what you think is something outside his area of knowledge. I won't call it expertise, though it would be, but outside his area of knowledge, and you start objecting. So this is sort of down the road from when these questions first get sorted out, it seems to me, not that that affects ultimately our ruling. It just seems odd the way this played out. I think, as Justice Prado pointed out, he's kind of a combination fact witness, expert witness. So the line is not as delineated as if, say, you had an accident reconstruction expert and you go through the background and you say, Your Honor, we tender Mr. Smith as our accident reconstruction expert, and he is or isn't. You know, Dr. Durett clearly had firsthand factual knowledge that he's able to testify to, so I think when you have kind of a blurred line witness like that, the procedure isn't quite as formal as it would be with just an expert witness that you'd hired. Well, but you had a treating physician. I did. That you offered up as an expert. Correct. That's a blurred line. Well, I think the procedure was the same with Dr. Margolis, where we went through his credentials and background and history, and then we jumped into the treatment of . . . So you never offered him up as an expert in any field or . . . I never made a formal request to the court to accept him as an offer. I don't think anybody would ever challenge Dr. Margolis' qualifications to testify to what he testified to, but clearly he's a mixed bag fact witness and expert witness. All right. I guess I'm just trying to get at maybe I've been out of it so long, nobody offers them up as an expert anymore. You just put them up and then they get accepted as an expert in the field of whatever it is they're going to be talking about. Apparently nobody specifically identifies that field. Respectfully, I've never seen anyone offer up as officially as you're suggesting. All right. How do you know what field they're going to be testifying as an expert in if nobody bothers to ever say it? Well, obviously we have designations, depositions, reports. We know where he's going, and if we have a problem with the qualifications, we're going to file our motions accordingly or make our objections at trial accordingly. All right. All right. Mr. Garrett's testimony about the ulcers is one issue, but he went far beyond that. He started testifying about biomechanical engineering, how this device works, and frankly he's wrong, but that's not surprising because his training in that was two sales seminars that he went to for the people who actually sell the device. He testified to things like it resurrects the nerves. That's not accurate. But that's what he was taught in his sales seminar, so clearly going to two sales seminars about the device is not going to qualify you to testify about how the device works in a biomechanical engineering manner, how does it affect the body, how does it help reduce peripheral neuropathy. So I think at the end of the day, what Dr. Durrett testified to and what he said, he couldn't do in practice, and if he can't do it in practice, there's no way that he can come into court and testify as an expert witness on those issues. Thank you. Mr. Barkley. May it please the Court. The issue in this case is whether the Honorable Judge Hittner abused his discretion by allowing Dr. Durrett to testify. Dr. Durrett gave substantial testimony that was not objected to by the plaintiffs. That testimony by itself is the most important part of Dr. Durrett's testimony. Now, there are really three reasons why this Honorable Court should affirm the defense verdict and affirm Judge Hittner's reasons. First, this is not a malpractice case. Much of the testimony objected to from the standpoint of Dr. Durrett was talking about what could have been done, what should have been done. That's not what this case is about. This case is about whether the proneural light was unreasonably dangerous and caused burns to Mr. Carlson's feet. That's the issue in the case, not whether it should have been administered, not whether Dr. Durrett did it correctly, but was the machine unreasonably dangerous and was that a producing cause of Mr. Carlson's injuries? Secondly, what actually caused the burns on Mr. Carlson's feet? And then finally, as I said, Dr. Durrett's key testimony was that the burns where he saw them were not in the area that the proneural light was administered. Let me go through that. Dr. Durrett testified without objection that from what he saw, the burns were to Mr. Carlson's heels. The proneural light was applied to the bottom of the soles around the top, and there were no burns in that area. So that got in without objection, and from that the jury could certainly find that the proneural light was not a producing cause of Mr. Carlson's injuries. Did Dr. Durrett apply it in Mr. Carlson's feet? He did not. He had staff that did, but Dr. Durrett examined Mr. Carlson's feet when Mr. Carlson returned. Well, that takes me to a different concern, but initially his testimony in connection with where the light should be applied is just, I went to the classes, or at least it ought to be limited to that. I went to the classes, and this is where they say you apply the light. I wouldn't have any problem that he could testify to that. I'm just saying as regards to the placement of the light, that's all he can say. He understood that the light had been placed on the bottom of Mr. Carlson's feet. So somebody told him that's where it was placed. I think so, Your Honor. All right. And then when he looked at the photographs, the photographs showed damage to Mr. Carlson's heels, and he testified, thought it might be a diabetic ulcer, but wasn't sure. What's even more interesting is that Dr. Durrett went after him. What qualifies him to offer that opinion about what the cause of the wound was? It was, it may have been speculation on his part, but even then he had been a chiropractor for many, many years, had treated diabetic neuropathy on the feet, and Judge Hittner found that he was qualified to give that opinion. But then what was interesting in this case is that he was asked, do you think that the proneural light or what caused these burns? And he said, I don't know. It's a mystery to me. It's conflicting facts. And there was no definite testimony by Dr. Durrett that the proneural light caused or did not cause the burns. So that's your argument, that he gave an opinion that he may not have been qualified to give, but it didn't matter because it was an inconclusive conclusion. He said, well, I really can't tell whether that caused it or something else may have caused it. Correct. And over and above that. But that's an opinion, though, isn't it? Yes. But over and above, but Judge Hittner allowed him to give that opinion. And I think Judge Hittner, as well as the counsel who actually tried the case, were surprised when Dr. Durrett. He's the only witness the defendants called. Correct. And I'm asking you to speculate, but you likely would not have called him if his opinion was that the proneural light caused the wounds. That's probably true. All right. So this opinion, the one that you said had no real value, you likely wouldn't have called him if you didn't think it had some value. His opinion that you can't really tell what caused it. The testimony that I believe, having reviewed the record, what's more important was that where the proneural light, where Dr. Durrett thought the proneural light had been applied, there were no burns, there was no damage, there was no injury there. But even on that, he wasn't in there when it was applied. His testimony in that connection was this is where it's supposed to be used. Isn't that right? Yes, but there was no contrary testimony. All right. Did the expert for the defense say that it appears that the pads were put in the wrong place and that's why the heel was burned? Was that testimony, was there such testimony? I don't recall that, Your Honor, either way. Well, maybe opposing counsel will recall. Thank you. Now, but the other issue, if the proneural light got hot, that doesn't mean it's a defective product. Example is a heating pad. If you apply a heating pad and leave it on too long, you can cause burns to people. I've had cases like that in the far distant past. But the point is just because the proneural light was hot, if it was hot, does not mean that it was unreasonably dangerous. And in this connection, nobody was able to state with certainty what the temperature of the proneural light was when it was applied to Mr. Carlson's feet. He testified that it only goes up two degrees above body temperature? Correct, but there was no testing of the specific device that actually later I think it was tested and they found it got to about 86 degrees Fahrenheit. But there was no testing saying that this is the temperature to which it got and this is unreasonably dangerous. And over and above that, the jury had the proneural light. They had the one involved in this accident. They took it to the jury room and the jury found a verdict in favor of bioremedy by client. So if you look at even if you believe that Dr. Durrett should not have testified as to causation, he certainly was capable based on his education and experience of testifying where he believed the proneural light was or should have been applied and there was no testimony to the contrary. At that stage, you've got the testimony. The proneural light is where it was applied. There were no burns. Dr. Durrett said, I can't say whether the proneural light caused it or did not cause it. There was no testimony as to the temperature that the proneural light reached. And how do you get to a how do you affirm a product's verdict when you can't even say specifically under reasonable probability or by preponderance of the evidence that the proneural light got to a temperature sufficient to cause the type of burns experienced by Mr. Carlson? Did they call an expert who said that? I don't believe so, Your Honor. The product was effective. They didn't call anybody. I think they did, but I don't think they got to causation. In other words, that you've got to say if I have a heating pad and I apply a heating pad to the bottom of someone's feet and leave it there, it is very possible that that individual can have burns on their feet. But that doesn't mean that the heating pad is defective. What makes a product defective is either it's unreasonably dangerous because it's just way too hot, temperature of boiling water, no evidence to that, or it's applied improperly. And if the proneural light was applied improperly, that legitimately should have been at Dr. Durrett's doorstep. But he was not brought in as a defendant to the case. And I don't know why Dr. Durrett was not brought in. I just don't know that. But if I were here defending Dr. Durrett in a medical negligence claim, then all of the things about, well, it shouldn't have been applied, it doesn't do this, it doesn't do this, as the proneural light, that might be very relevant. But they're saying that the proneural light was defective because it was hot enough to burn Mr. Carlson's feet and that made it unreasonably dangerous. That was an issue that the jury decided against the Carlsons. They could have decided elsewhere otherwise, I suspect, but the jury just did not agree with the plaintiff's contentions. Again, I think that the court and the lawyers were surprised that Dr. Durrett was brought in. They were surprised when Dr. Durrett would not testify as to causation. I think the court certainly was. But you have to, in order to reverse, you have to believe that Judge Hittner abused his discretion in allowing Dr. Durrett to testify. And Judge Hittner— They're not complaining that he should have been excluded completely from testifying, are they? That's not their complaint. They're complaining about part of the testimony of Dr. Durrett, but that was let in over objection, and that— So you say the issue is whether or not he should have been allowed to testify. The issue is whether or not he should have been allowed to testify as to some of the opinions he offered. His opinion as to causation, which then he came out and said, I can't say, which is kind of interesting. But you'll agree with me that's better than a, yeah, it caused it. Absolutely. All right. But I don't think that Dr. Durrett's testimony was what defendant's trial counsel was expecting either. I have a suspicion that both counsel were expecting Dr. Durrett to say, yes, it caused it, no, it didn't, not, well, I can't say. I have conflicting facts. Are you telling me trial counsel for the defendant called an expert witness that he expected to say that the product caused the injury? No. He expected he might say that? No. I'm saying I expected he would say that it did not cause the injury. All right. And I'm expecting—but that's sort of where, you know—but anyway, but the question is, should this be reversed? No. To reverse, first you have to find that Judge Hittner abused his discretion, and Judge Hittner heard the testimony, heard Dr. Durrett's testimony about his qualifications, and allowed the testimony, with an instruction to the jury to give it such weight as the jury determined appropriate. And then, based upon that, the jury came back and said, no, we don't believe it. We don't believe that this is a defective product. And if you look at the proof, you know, where is the proof that the product itself was defective and unreasonably dangerous? Because just the fact that it may have burned Mr. Carlson's feet does not— Did you move for a directed verdict at trial at the conclusion of this case? Yes. And Judge Hittner granted it on warnings, but let the defect—the design case go to the jury, if I remember correctly. We'll take time back if you don't need it. I've never gotten anywhere by talking too much. Thank you very much. How much time under that light could cause a burn to, you know— I think that's an LED. I think I'd be safe. Thank you, Your Honor. Mr. Farrow. Thank you, Your Honors. I just want to address a couple of brief issues. One, the issue that we didn't put on evidence that the device was defective or could cause burns is inaccurate. We put on Dr. David, who is—he ran the biomechanical department at the University of Texas for 35 years and serves on the FDA's medical device advisory board. He testified in detail about why the device is defective and how it causes burns. And I guess it probably really wasn't—since you told me you don't offer him up, he was an expert in the field of— Biomechanical engineer. All right. And correct, I don't think we did do the offer. But he testified using the own internal documents of the defendants showing that the device gets to 42 degrees Celsius. The FDA warns in their 510K hazard assessment documents that 41 degrees Celsius can cause burns. So we had the internal documents of the company showing the device can get to 42 degrees. Obviously, it can cause burns. So that was our general causation. Dr. Margolis is treating podiatrists was our specific causation. He testified that he met with his team of physicians. Obviously, Mr. Carlson had some health issues. So he met with his entire team, his vascular surgeon, his cardiovascular doctor and himself, and other specialists. And they all came to the conclusion that these were burns caused by the proneuralite device. So we definitely had the general causation. We had defect testimony, and we had specific causation. I don't think those issues are necessarily before the court, but I just wanted to clear the record on that a bit. Wasn't there a problem, your brief points out, of the actual equipment not being available for a while? And once it's finally tested, there were questions raised about whether something had occurred to it in that passage of time? It was. The device was missing whenever we got involved. And then years down the road, it was found. And when we tested it, it got to 80-something degrees. So clearly something had happened to the device. Old age, maybe. Yeah, 80 degrees wasn't going to do a whole lot for you. It had been cold, and obviously the device was supposed to heat up. Regarding the placement of the pad, Mr. Carlson absolutely testified that it was on his heel. So there is evidence that it was on his heel. And if you go to Dr. Durrett, and we question him about it, if you go to his website right now, it shows the proneural light device on a patient's heel. So the idea that it wasn't touching his heel is a bit dubious, especially with Dr. Durrett never seeing it. Isn't that more of a malpractice issue? I mean the jury got that, but there's also testimony it should not have been on his heel, which I think came from Dr. Durrett. You've got a product liability case, not a malpractice case. It's not a malpractice, and the reason Dr. Durrett was never brought into the case is the proneural light device, the way the device is built, it's designed to go in multiple places on the foot. It's designed to go on the heel or go over the toe like Dr. Durrett testified. So I don't think Dr. Durrett did anything wrong. In fact, the warnings case, which was not dismissed by a directed verdict, by the way, but the warnings case was strong because the warnings that the defendants had they never gave to their practitioners. The practitioner actually had to make a special request for the warnings. So our position was always Dr. Durrett was just ill-informed. He went to a cell seminar headed by a guy named Dr. Diderot, who claimed to be a neurologist, who was in fact not a neurologist. He was also a chiropractor, and it's a swindle, you know, and he got swindled, and it's not Dr. Durrett's fault he got swindled. I think his testimony about the cause of the burn was a little bit of a self-preservation, but the guy just got swindled. But were you able to—I know you objected to these things and the judge overruled and allowed the witness to testify, but were you able to cross-examine him about his opinion or his answer to the questions that he was asked on direct? Sure, I was, and that's the instruction that the judge gave was the fact he's a chiropractor goes to the weight of his evidence, not the admissibility, which the Ulan court in the Seventh Circuit said that ruling is wrong. But I was allowed to cross-examine him that he didn't see it on his foot that he's a chiropractor and he's testifying against the treating physician's diagnosis and prognosis, so I was able to explore those issues. But Dr. Durrett was the only evidence that came in that said these wounds were not burns and were not caused by the device. And the idea that he opined that he didn't have an opinion as to the cause, when he testified that those wounds are diabetic ulcers and not burns, he is absolutely testifying that, in my opinion, the device didn't cause those burns. Thank you. Thank you. Thank you, gentlemen. That concludes this panel sitting for this week. Thank you, Ms. Engelhardt, and court will be in recess.